IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS MARCH 27, 2008

## IN RE: G.N.S., d/o/b 10/09/03

**Direct Appeal from the Juvenile Court for Madison County**
**No. 43-38, 217     Christy R. Little, Judge**

**No. W2007-02009-COA-R3-PT - Filed July 31, 2008**

In this appeal, a mother and father challenge an order terminating their parental rights.  We affirm the order as it pertains to the mother, and we reverse as to the father.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Jeremy B. Epperson, Pinson, TN, and Carl E. Seely, Jackson, TN, for Appellants

Steven W. Maroney, Matthew R. West, Jackson, TN, for Appellees

Robert E. Cooper, Jr., Attorney General and Reporter, Douglas Earl Dimond, Senior Counsel, Nashville, TN, on behalf of Attorney General's Office

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

This is the second time this case is before us. In *In re G.N.S.*, No. W2006-01437-COA-R3-PT, 2006 WL 3626322 (Tenn. Ct. App. Dec. 13, 2006), we vacated an order terminating Mother and Father's parental rights because the trial court failed to make written findings of fact and conclusions of law as required by Tenn. Code Ann. § 36-1-113(k). We remanded the case with the instructions that the trial court enter the appropriate findings. On August 14, 2007, the trial court entered a judgment with the requisite findings of fact and conclusions of law, which terminated Mother and Father's parental rights. This second appeal ensued.

Although we have already discussed the background of this case in the prior appeal, we recite the facts here. On October 12, 2004, DCS filed a petition to adjudicate Mother and Father's minor child, G.N.S. (born October 9, 2003), dependent and neglected. Two days prior, the Drug Task Force responded to an alleged meth lab located in Father's trailer behind Mother's grandmother's house in Madison County. At the time, Mother was incarcerated and apparently in some type of drug rehab program. According to Father, he and G.N.S. were staying with the grandmother, as electricity was not yet connected in the trailer. Found in the trailer were family items, including diapers, formula, toys, and clothing. The Drug Task Force also found several chemical ingredients in a cooler in the trailer that are commonly used in the manufacture of meth. The grandmother stated to the investigators that Father and G.N.S. were sleeping in her house because the trailer lacked electricity. She did say that the trailer had a working refrigerator that was hooked up to an extension cord running from her house. Father contended that he allowed an out of town friend to stay at the trailer, and that he knew nothing of the meth ingredients found there.

On the same day DCS filed the petition, the court held a preliminary hearing. The court entered an order on November 5, 2004, finding probable cause that G.N.S. was dependent and neglected, based "upon the parents['] incarceration and the lack of an appropriate relative[.] . . ." The order further read:

> 2.    That the Court advised the parties that [Father] did not in fact have custody of the minor child, that he had petitioned the court for [ ] custody[1] but that same had been denied when he tested positive for cocaine in court previously.
>
> 3.    That [Father] submitted to a drug screen this date which showed he was positive for cocaine and the test was iffy as positive for amphetamines and/or methamphetamines.
>
> 4.    That there was a pending criminal warrant or warrants for [Father's] arrest with which he was served in court this date. He was taken into custody this date on said warrant or warrants.

---

[1] Mother and Father are married, but is unclear as to the marriage date.

At the dependency and neglect hearing on November 16, 2004, both Mother and Father waived the right to contest the allegations, and the court entered a finding of dependency and neglect on December 6, 2004. G.N.S. was placed in foster care, and a permanency plan was entered into. The permanency plan is not included in the record. The order adjudicating G.N.S. dependent and neglected, however, makes reference to the plan, stating that the goal is reunification. The DCS caseworker's affidavit relevant to the permanency plan reads as follows:

> What specific services are necessary to allow the child(ren) to remain in the home or to be returned to the home? Visitation is to be supervised at the Carl Perkins Center upon exiting incarceration. [Mother and Father] are to actively seek out treatment for A & D issues which may include detox, inpatient, outpatient treatment, or attending AA or NA meetings on a weekly basis. Also, [Mother and Father] are to maintain steady employment and stable housing for [G.N.S.].

The first foster care placement of G.N.S. only lasted three days, and DCS then approved placement with Father's sister and her husband ("Aunt" and "Uncle") on November 16, 2004. Aunt and Uncle live in McMinnville, Tennessee. On March 7, 2005, the trial court granted Aunt and Uncle legal custody of G.N.S.

Aunt and Uncle filed a petition for the termination of Mother and Father's parental rights on March 2, 2006. The termination hearing was held on May 16, 2006. Both Mother and Father were incarcerated, but both attended and were represented by separate counsel. Mother had been in jail, apparently for violation of probation, until November 2, 2005, when she was released. She remained out until November 11, 2005, when she was arrested for failure to appear. Subsequently, Mother pled guilty to theft of property under $500, a Class A misdemeanor, and was sentenced to 11 months and 29 days on March 27, 2006. On that same day, Mother also pled guilty to forgery, a class E felony, and was sentenced to 2 years. At the time of the hearing, Father had been incarcerated for 19 months due to his involvement with the "meth trailer." Father was initially charged with several counts, including the manufacture of methamphetamine and reckless endangerment, but the state dismissed those charges and Father pled guilty to possession of drug paraphernalia, a Class E Felony, and was sentenced to a year.[2]

Father testified that he was previously up for parole, but that Uncle drove from McMinnville to Jackson to attend the parole hearing and made a statement to the parole board that he did not think Father should be released because he had not served enough time "for everything he had put his

---

[2] Apparently, another individual pled guilty to the manufacture of meth. When questioned by the judge as to why Father was serving 19 months on a one year sentence, he responded that in 2000, he was sentenced to six years, and when he was charged with possession of drug paraphernalia, that violated his probation, and "they made seven [years] out of it." It is unclear what the six year sentence was related to.

family through." Uncle did not deny that he made a statement at the hearing. Father testified that he has appealed the parole board's decision, but a final decision had not been entered. He testified that if the appeal is not successful, he will have another parole hearing in ten months. Otherwise, Father testified that his release date would be in about fourteen months.

As to the relationship between Mother and Father, four months prior to DCS' involvement, Father sought an ex parte order of custody, alleging that Mother had kidnapped G.N.P. and that Mother was on "crack." The court did not grant the order because Father tested positive for cocaine. Mother testified that she and Father were having some "problems" and that she took G.N.P to her sister's house. She denied that she was using cocaine at that time. Father testified that he only filed that report because he was angry at Mother.

Father testified that prior to DCS' involvement, he, with the help of Mother's grandmother, was raising G.N.S. At the time, Mother was incarcerated for violating her probation.

Father denied that he had ever "been a [drug] user/abuser. I've usually - - it's a binge thing. But I've learned a lot in 19 months in this [substance abuse] program, and I plan on applying it." Later, when questioned by the court, "You don't think you're a drug addict?", Father responded "Yes."

As to his financial situation, Father was fired from his job at a factory in August of 2004, and prior to his arrest, he worked as a forklift driver. Father is college educated, with a bachelor's degree in engineering and a minor in mathematics. Currently incarcerated, Father makes 34 cents an hour and testified that he is currently unable to financially support G.N.S. while incarcerated. Father testified that he has two other children from a previous relationship that live with their mother in McMinnville. He stated that he is in arrearage on his child support due to his incarceration, but that he also fell behind on his payments in 1998.

As to Father's attempts to contact G.N.S., Father contended that Aunt and Uncle's home phone blocked his calls:

> Q. All right. There's been a lot of discussion today about whether or not calls have been blocked. So far, I've not actually heard anybody testify that a call was blocked . . . . So let me ask you. Is it your understanding that your calls to [Aunt and Uncle] have been blocked?
> A. Yes, sir.
> Q. Why is that your understanding?
> A. . . . There's a block on the number, and that's exactly what the recording tells you. They might not be aware of it. Why would they? They've never been incarcerated and called theirself, [sic] but you can sure go over there and call it from Madison County and that's exactly what it'll tell you. . . .

> And I'm not saying that this was all done intentionally. My sister may not be aware of this . . . .

Both Aunt and Uncle denied having a block on their phone since gaining custody of G.N.S., although they did admit that they had a block on their phone in the past. Father wrote Aunt several letters in jail, to many of which Aunt did not respond. Father requested that Aunt send him pictures of G.N.S., but he contended that she never sent any.

As to the trailer, Father testified as follows:

> Q.    Okay. And you agree there were clothes and toys and items belonging to G.N.S. that were in that trailer?
>
> A.    Yes. [Mother] and Grandma moved daily, hoping to - - I mean it took - - we was trying to get it together. We was trying to get it liveable, get underpinning. I did it all myself, from running the heater pipes, the septic tank, you know, setting the pole . . . .
>
> Q.    Okay. So, even though, as I understand your testimony, you say you were not living in the trailer, it was your plan to get into the trailer.
>
> A.    Correct.

When asked whether G.N.S. spent any time in the trailer, Father testified that while he was at work, Mother and grandmother would go to the trailer to clean and work on it at night, taking G.N.S. with them.

Mother testified that prior to her incarceration, she had completed a three month inpatient drug treatment program. Mother returned to jail, however, when she failed a drug test. Apparently while still serving her sentence, she then attended a different rehab program and was released from jail, where she began an intensive four week outpatient treatment at Pathways. Mother testified that she is currently incarcerated for failure to appear, because, according to Mother, her sister was ill and she had no way to court. Mother's release date would have been May 24, 2006, but because she violated her probation due to a failure to appear in drug court, she testified that she should be released sometime in August of 2006. Mother explained that while in jail for the failure to appear, she was served the warrant for forgery. When asked directly how many times Mother had been in jail since G.N.S.'s birth, she answered, "three or maybe four." Mother admitted that she had a problem with drugs in the past. She testified that she began doing drugs when she was around 16 or 17 years old.

Concerning Mother's financial situation, she testified that upon release, she would return to a job she previously held at a family member's cleaning service, earning around seven dollars an hour. Mother does not have a high school diploma. When asked about her living situation upon her release:

Q. Is it your plan to relocate to the trailer when you get out of jail?

A. Yes, sir, it is. Me and my husband has talked about that.

. . .

Q. Just so I'm clear - -

A. It's nothing but nightmares to me about the things that went on in the trailer. . . . We own this trailer. This trailer is in my husband's name, but that does not necessarily mean that's where we're going to live.

She later testified that she would probably move in with the grandmother upon release.

While out of jail from May of 2005 until her return to jail in November of 2005, Mother visited G.N.S. once. Mother's mother had visited G.N.S. on several occasions, and the grandmother asked Aunt if Mother could come along. At first Aunt and Uncle were hesitant to allow Mother to visit, but after talking it over, they called the grandmother back and said that Mother could come along on the visit. The parties met half way, at Bellevue Center mall. The meeting ended abruptly with Mother's grandmother and Aunt getting into an argument. This meeting occurred sometime in May of 2005. Soon thereafter, Mother failed a drug screen.

Mother also testified that she tried calling several times while briefly out of prison, and that no answering machine would pick up, but rather, the phone would "ring and ring." Aunt testified, on the other hand, that they have an answering machine and that Mother had not contacted her.

The guardian ad litem's opinion was that Mother and Father's parental rights should not be terminated:

I'm concerned because I don't see any proof that there was a meth lab there. I see that there were ingredients there. I don't see any proof that the meth lab pointed directly to the dad who was not incarcerated at that time. There does look like there was a third party involved. . . . I'm not convinced that this child was exposed to that meth lab. Another thing that really bothers me is I think - - although [Aunt and Uncle] have done a very good job, I think it's clear that they have blocked access to this child. I think with phone calls, with cards, with not allowing many visits, with going up to the parole hearing. I mean that's just a wonderful way to set it up for dad not to be able to be there.

. . .

[F]our months before he was incarcerated, which is what we have to look at instead of four months before the petition, that he was filing some false pleadings, I'm not sure that one incident like that, that he has not been tried for, is enough to show clear and convincing

-6-

[evidence] that he was in wanton disregard for the child. The child, I think, needs to stay right where she is. . . . [T]he parents need to be given another chance.

The court entered an order on June 14, 2006, but as stated earlier, failed to make sufficient written findings of fact and conclusions of law. An appropriate order was entered on August 14, 2007, which reads, in part:

4.      The following findings of fact and conclusions of law support this finding and cumulatively constitute clear and convincing evidence of grounds for termination and determination of the child's best interest:

a.      On October 10, 2004, the Drug Task Force responded to a possible meth lab. Several ingredients were found that are used in the meth manufacturing process and investigation of the trailer did reveal that items belonging to the family, including diapers, formula, toys, and clothing were found in the residence. This investigation initiated the events that took custody from Respondents and placed minor child with Petitioners.

b.      At the time of the hearing, Father [ ] had been in prison for fourteen months and during said time received wages of thirty-four cents an hour. However, [Father] failed to make financial contributions or otherwise support minor's care. Further, during incarceration, [Father] never telephoned the custodians to communicate with the minor or otherwise indicate a desire to communicate or see the minor. Said actions constitute a willful failure to visit, willful failure to support, or willful failure to make reasonable payments toward the support of the child. . . .

c.      Mother [ ] was imprisoned until May of 2005. Since release and until [the] date of hearing, [Mother] failed to provide financial support and has failed to initiate any communication with Petitioners concerning providing financial support for minor. Since minor came into the custody of Petitioners, [Mother] attended only one visit with minor. Although a second visit was scheduled for July of 2005, [Mother] did not show up. Otherwise, [Mother] initiated no further contact or any attempt to visit minor. Said actions constitute a willful failure to visit, willful failure to support, or willful failure to make reasonable payments toward the support of the child. . . . [Mother's] sole visit was only token visitation.

> d. Mother [ ] has failed to address her drug addiction since this case came in front of the Court in October of 2004. Said failure constitutes a failure to effect a lasting adjustment to remedy her drug problems and constitutes a failure to remedy the conditions that initially took the minor child from mother's custody.
>
> e. It is in the best interest of minor that the parental rights of both [parents] be terminated for the reasons cited in a - c herein above. In addition, the Court notes that minor is more bonded to the Petitioners than the natural parents and it is in the best interest of minor that Respondents' parental rights be terminated.

## II. ISSUES PRESENTED

Mother presents the following issues for review, which we slightly reword:

1. Whether there is clear and convincing evidence that Mother's parental rights should be terminated.

2. Whether the termination of Mother's parental rights is in the best interest of G.N.S.

3. "Whether the Trial Court's decision to terminate parental rights regardless of the parents' compliance with the Permanency Plan(s) negated the necessary element of willfulness."

Father raises the following issues:[3]

4. Whether there is clear and convincing evidence that Father willfully abandoned minor child.

5. Whether Aunt and Uncle's conduct prevented Father from "maintaining a relationship with his child."

6. Whether the termination of Father's parental rights is in the best interest of G.N.S.

## III. STANDARD OF REVIEW

It is undisputed that both the United States and Tennessee Constitutions protect parents' rights to the custody and care of their children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). "Therefore, before a parent's rights to a child may be terminated by a court, 'there

---

[3] Father also attempts to raise a constitutional argument for the first time on appeal which we will not address, as the issue is waived. *See In re Valentine*, 79 S.W.3d 539, 544 n.3 (Tenn. 2002).

must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated.'" *Id.* (quoting *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). In Tennessee, termination proceedings are governed by statute. A parent's rights may be terminated if there exists at least one of the statutory grounds for termination, and such termination would be in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1), (2); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004).

The lower court's decision to terminate parental rights should be made under a clear and convincing standard. *In re F.R.R.*, *III*, 193 S.W.3d 528, 530 (Tenn. 2006). Clear and convincing evidence should leave no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). "As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground[s] [ ] are reviewed de novo with no presumption of correctness." *In re Adoption of A.M.H.*, 215 S.W.3d at 810.

## IV.   DISCUSSION

### A.   *Clear and Convincing Evidence*

We first address Father's argument that there is not clear and convincing evidence to support the termination of his parental rights. Father was not incarcerated prior to DCS' involvement, and the uncontradicted testimony is that prior to his incarceration, he was the primary caregiver for G.N.S. The trial court should not have looked at Father's incarceration period when determining whether he abandoned G.N.S. by his failure to visit and/or support. The trial court's only basis for terminating Father's rights is as follows:

> At the time of the hearing, Father [ ] had been in prison for fourteen months and during said time received wages of thirty-four cents an hour. However, [Father] failed to make financial contributions or otherwise support minor's care. Further, during incarceration, [Father] never telephoned the custodians to communicate with the minor or otherwise indicate a desire to communicate or see the minor. Said actions constitutes a willful failure to visit, willful failure to support, or willful failure to make reasonable payments toward the support of the child . . . .

**(Supp R p3).** Tenn. Code Ann. § 36-1-102(1)(A)(iv) defines abandonment as applicable to this case:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action

or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Thus, the wrong definition of abandonment was applied. Aunt and Uncle argue in their reply brief that the trial court's decision to terminate Father's parental rights based on abandonment is supported by his wanton disregard for G.N.P.'s welfare. While it is true that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child[,]" *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005) (citations omitted), the trial court did not find that Father's rights should be terminated based on a wanton disregard for the child's welfare. Aunt and Uncle rely on *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892 (Tenn. Ct. App. Dec. 6, 2004), in support of their position that this Court should perform an independent review of the record and affirm the trial court's finding of abandonment, but they have misstated the holding in that case. In the case of *In re Adoption of S.M.F.*, the Middle Section of this Court affirmed the trial court's decision not to terminate the parent's rights because there lacked clear and convincing evidence of willful abandonment. Distinguishable from this case is the fact that the *In re Adoption of S.M.F.* trial court did find that there lacked clear and convincing evidence of abandonment. Turning back to this case, we simply cannot make a ruling that the trial court chose not to make. We have no choice but to reverse the trial court's order as it pertains to Father, as no other ground was cited to support the termination of his parental rights.

Likewise, Mother was incarcerated when Aunt and Uncle filed the termination petition. Curiously, the trial court applied the correct abandonment provision and looked to the period to which Mother was out of jail for the second time, from May 2005 until November 2005.

As to Mother's failure to visit, she testified that she visited only once in May, which was the visit at the mall that ended with Mother's grandmother and Aunt getting into an argument. Soon after this visit, Mother failed a drug test. Mother testified that they had scheduled a second visit, but that she went back to jail before the visit occurred. Aunt testified, though, that they had a visit scheduled in July of 2005, but that Mother did not show up. Mother testified that she did not schedule a visit in July. Although Mother argues later in her brief that the placement of G.N.S. with Aunt and Uncle made visits difficult, Mother testified that her mother offered to take her to visit with the child at any time. While Mother testified that she called Aunt and Uncle "a lot," Aunt and Uncle testified to the contrary. The determination of witness credibility is best left to the trial court. *See In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) ("Insofar as the trial court's determinations are based on its assessment of witness credibility, this Court will not reevaluate that

assessment absent evidence of clear and convincing [ ] to the contrary.").  We find that the record clearly supports the termination of Mother's rights based on abandonment by failure to visit.  We also agree with the trial court that Mother's sole visit was only token.  See Tenn. Code Ann. § 36-1-102(1)(C).  We also point out that Mother does not raise issue with the termination of her rights based on persistent conditions.

### B.  Best Interest

Mother argues that the termination of her parental rights is not in G.N.S.'s best interest.  Mother contends that she "was in the process of resolving her criminal problems," and addressing her "issues" with drugs.  Whether the termination of Mother's parental rights is in the child's best interest must be viewed from the child's perspective, and not the parent's.  ***In re Audrey S.***, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citations omitted).  The court is to look at the following factors in determining the best interest:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian

-11-

from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5- 101.

Tenn. Code Ann. § 36-1-113(i).

The court, in making its decision, does not necessarily need to address each of the nine factors; rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 879. In this case, the trial court found that G.N.S. was more bonded with Aunt and Uncle than with Mother and Father; Mother had not addressed her drug problem and is incarcerated; and Mother, while out of jail, only visited with the child once, and made no other contact. The fact of the matter is that due to Mother's choices, G.N.S. does not know her. While this Court hopes that Mother is sincere in her stated resolve to turn her life around when she is released from jail, we find that the trial court did not err in making the best interest determination.

### C. Permanency Plan

Finally, Mother argues that the entry of a parenting plan negates "the necessary element of willfullness [sic]." Mother contends that "nowhere in the order drafted by the state does it indicate that the existing Permanency Plan . . . was no longer in effect." The permanency plan that Mother speaks of is not in the record.[4] We can be sure, though, that Mother's testing positive for drugs and returning to jail for failure to appear in drug court were not any of the outlined steps the permanency plan called for in order for reunification to occur. This argument has no merit.

### V.  CONCLUSION

---

[4] Appellants have the duty to provide this Court with the record, which should convey a fair and complete account of the proceedings below which forms the basis of the appeal. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005).

For the aforementioned reasons, we reverse the order as it pertains to the termination of Father's parental rights. We affirm the termination of Mother's parental rights. Costs of the appeal are assessed one-half against Appellant Mother and one-half against Appellees, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.